[DO NOT PUBLISH]

# In the
# United States Court of Appeals
# For the Eleventh Circuit

_____

No. 22-10865

Non-Argument Calendar

_____

MARTIN E. O'BOYLE,
JONATHAN O'BOYLE,
WILLIAM RING,

                                          Plaintiffs-Appellants,

versus

COMMERCE GROUP, INC., et al.,

                                          Defendants,

TOWN OF GULF STREAM,

                                          Defendant-Appellee.

―――――――――――――

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:19-cv-80196-AMC

―――――――――――――

Before ROSENBAUM, GRANT, and LUCK, Circuit Judges.

PER CURIAM:

We deny the appellants' petition for rehearing but withdraw our previous opinion dated Feb. 8, 2023, *O'Boyle v. Com. Grp.*, No. 22-10865, 2023 WL 1816381 (11th Cir. Feb. 8, 2023), and substitute the following opinion in its place:

★　　★　　★

Martin O'Boyle, his son Jonathan O'Boyle, and their lawyer William Ring sued the Town of Gulf Stream for violating the First Amendment by allegedly retaliating against their extensive public records litigation. The district court granted summary judgment in Gulf Stream's favor because the town had probable cause to take the allegedly retaliatory conduct. On appeal, Ring and the O'Boyles argue that they did not need to show a lack of probable cause to show retaliation. But, under our precedent, they did. So we affirm.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This opinion is the third in a saga that chronicles Martin O'Boyle's feud with Gulf Stream and its leadership. *See Town of*

*Gulf Stream v. O'Boyle* (*O'Boyle I*), 654 F. App'x 439 (11th Cir. 2016); *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277 (11th Cir. 2019). Most of the relevant facts are set out at greater length in *O'Boyle I* and *DeMartini*, so we tell here an abbreviated version of the story.

### A.

Martin O'Boyle is a Gulf Stream resident who has long disliked town leadership. After the town denied him a building permit, he painted cartoons on his house ridiculing the town's mayor and hung signs criticizing town leadership from a truck that he parked at the town hall. He also began filing public records requests with the town, often in the name of various companies he owned. In January 2014, O'Boyle started the Citizen's Awareness Foundation, Inc., a nonprofit ostensibly dedicated to government transparency, and staffed it with his longtime employees and business associates. The Foundation also lodged public records requests against the town, overwhelming the small handful of municipal staff who had to respond to them. *See DeMartini*, 942 F.3d at 1281–82. Between 2013 and late 2014, O'Boyle and his associates filed nearly 2,000 public records requests—many for vague and hard-to-identify topics like "[a]ll email addresses created or received by the Town of Gulf Stream" or "[A]ll phone numbers in the town's records." *Id.* at 1282 (citing *O'Boyle I*, 654 F. App'x at 441–42).

When the town failed to respond timely to a public records request, Martin O'Boyle or the Foundation would sue the town

under Florida's sunshine law. *Id.* at 1283. Jonathan O'Boyle and Ring—both attorneys—represented the entities related to Martin O'Boyle in these lawsuits. *Id.* Usually acting through The O'Boyle Law Firm, Jonathan O'Boyle and Ring would sue or threaten to sue the town, then demand settlements far in excess of costs and fees actually incurred. *Id.*

In April 2014, Gulf Stream's town commission elected a new mayor, Scott Morgan. Frustrated by the lawsuits and records requests that Martin O'Boyle and his team were filing, Mayor Morgan announced in a letter to Gulf Stream residents that the town would be "stepping up its defense" of the litigation and taking a "firm stance . . . to limit the detrimental effects" of the lawsuits on the town's morale and budget. The letter stated that by June 2014, the town had spent more than $160,000 in legal fees—against a legal budget of $15,000 for the whole year—defending the lawsuits and receiving advice on how to combat the O'Boyles' activities.

Gulf Stream and its outside counsel took a three-pronged legal approach to fighting the public records litigation, all starting in early 2015. First, the town filed several counterclaims in one of the state-court public records lawsuits and moved for sanctions against Jonathan O'Boyle and Ring, based partly on their flying banners and signs that the town felt demeaned its outside counsel. Second, Mayor Morgan filed bar complaints against Jonathan O'Boyle and Ring that alleged the two had violated various legal ethics rules. Third, the town sued the O'Boyles, Ring, The O'Boyle Law Firm, and several others in federal district court under the Racketeer

22-10865               Opinion of the Court                        5

Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962(c), 1964(c).

At a town meeting in September 2015, Mayor Morgan expressed hope that the town's legal strategy was working. He stated that "[t]hings have returned, at least in physical and visual nature, to the way [the] town used to be," because the O'Boyles were no longer flying banners critical of the town. Mayor Morgan said that if the banners started flying again, "that would be deemed abusive and malicious, with legal connotation." He also told the town that the number of public records requests had decreased substantially and that the public records lawsuits were "winnowing down" in response to the motions for sanctions they had filed.

Meanwhile, in the courtroom, the town mostly saw defeat. The Florida Bar declined to discipline Ring or Jonathan O'Boyle, and the state court declined to sanction them. The state court also dismissed the town's counterclaims. The federal district court dismissed the RICO suit, and we affirmed the dismissal because the town had not alleged facts showing that Martin O'Boyle and his associates had conspired to do anything illegal. *Boyle I*, 654 F. App'x at 445.

After the town meeting in September 2015, Gulf Stream Police Sergeant John Passeggiata saw Martin O'Boyle attempting to write on a bulletin board in the lobby of the town hall. Sergeant Passeggiata and his boss, Police Chief Garrett Ward, confronted O'Boyle to get him to stop. O'Boyle and Chief Ward began arguing, and eventually the officers escorted a noncompliant O'Boyle

out of the building. While O'Boyle was being driven away by ambulance—he had suffered minor injuries in the scuffle—Chief Ward told Sergeant Passeggiata that he would charge O'Boyle for the incident. The State Attorney filed an information against O'Boyle for trespass, resisting arrest, and disorderly conduct. In August 2021, a state judge dismissed the trespassing and resisting arrest charges, and a jury found O'Boyle not guilty of disorderly conduct.

B.

The O'Boyles and Ring sued Gulf Stream under section 1983 for allegedly retaliating against their First-Amendment-protected activity. The complaint identified three forms of alleged retaliation: (1) the town's RICO lawsuit, (2) the bar complaints filed against Ring and Jonathan O'Boyle, and (3) Martin O'Boyle's prosecution. After discovery closed, the parties filed cross-motions for summary judgment. The town argued that it had civil probable cause to file the RICO suit and bar complaints—and that the State Attorney had criminal probable cause to prosecute Martin O'Boyle—so the plaintiffs could not establish a First Amendment retaliation claim. The O'Boyles and Ring argued in response that they did not need to show a lack of probable cause because their case paralleled *Lozman v. City of Riviera Beach*, where the Supreme Court allowed a false arrest claim to proceed even though probable cause existed to arrest the plaintiff. 138 S. Ct. 1945, 1955 (2018). They also argued that, even if *Lozman* did not apply, there

was still a genuine dispute of material fact whether the town had probable cause to take legal action against them.

The district court initially denied summary judgment. It agreed with the town that *Lozman* did not apply, so the O'Boyles and Ring had to show the town lacked probable cause to take legal action against them. The district court relied heavily on our decision in *DeMartini*. There, we held that Martin O'Boyle's employee Denise DeMartini—not a party here—hadn't provided evidence that would bring her within *Lozman*'s exception to the principle that probable cause defeats a First Amendment retaliation claim based on an allegedly retaliatory legal process. *See DeMartini*, 942 F.3d at 1306. Based on *DeMartini*, the district court concluded there was no dispute the town had probable cause to file the RICO lawsuit—and the state-court counterclaims—notwithstanding additional evidence that Ring and the O'Boyles had submitted.

The district court also concluded that the town's bar complaints against Ring and Jonathan O'Boyle were "sufficiently analogous to civil litigation" that, unless *Lozman* applied, the town would prevail if it had probable cause to file them. And the town did have probable cause, the district court explained, to send the initial bar complaints. But there was a genuine dispute about whether the town had probable cause to file additional complaints after receiving notice that the initial complaints had been resolved.

Finally, as to the criminal charges, the district court found no genuine dispute that the state attorney had probable cause to prosecute Martin O'Boyle for trespass. But, the district court

concluded, there were genuine disputes as to whether there was probable cause to charge O'Boyle with disorderly conduct and resisting arrest.

After the district court denied summary judgment, the parties filed a joint stipulation that (1) the town hadn't filed additional bar complaints against Ring or Jonathan O'Boyle after receiving notice that the initial complaints had been resolved and (2) there was probable cause to charge Martin O'Boyle with disorderly conduct and resisting arrest. The district court then entered a revised order granting summary judgment for Gulf Stream. Ring and the O'Boyles timely appealed.

## STANDARD OF REVIEW

We review de novo an order granting summary judgment. *Broadcast Music, Inc. v. Evie's Tavern Ellenton, Inc.*, 772 F.3d 1254, 1257 (11th Cir. 2014). "Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

## DISCUSSION

The First Amendment's free speech clause, *see* U.S. Const. amend. I, "protects 'not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right.'" *DeMartini*, 942 F.3d at 1288 (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000)). A person who suffers retaliation for activity the First Amendment

protects can seek relief under 42 U.S.C. section 1983. *See Bennett v. Hendrix*, 423 F.3d 1247, 1249–50 (11th Cir. 2005). To do so, he must show that "(1) his speech was constitutionally protected; (2) [he] suffered adverse action such that the [government actor's] allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected speech." *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008).

Here, Gulf Stream concedes that the appellants engaged in constitutionally protected speech when they made public records requests, sued to enforce Florida public records laws, and offered to settle those lawsuits. *See DeMartini*, 942 F.3d at 1288. And the town doesn't dispute that its activities could deter a reasonable person from engaging in protected speech. *Cf. id.* at 1298–99 (analyzing First Amendment retaliation cases from other circuits that involved allegedly retaliatory lawsuits). The issue we must decide is whether a reasonable factfinder could conclude that Gulf Stream's lawsuit and bar complaints—or O'Boyle's criminal charges—were causally connected to the O'Boyles' and Ring's protected activity. *See Smith*, 532 F.3d at 1276.

To meet the causation element of a First Amendment retaliation claim, "a plaintiff must establish a causal connection between the government defendant's retaliatory animus and the plaintiff's subsequent injury." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (marks and citation omitted). But where the government actor can show it had probable cause to take legal action against the plaintiff's

protected activity, a retaliation claim will usually "fail[] as a matter of law." *Id.* at 1728.

We have recognized only two exceptions to this rule. The first is where the government has selectively punished the plaintiff but not others engaged in similar conduct. *Id.* at 1727. The second is in the "unique" circumstances presented in *Lozman*. *See DeMartini*, 942 F.3d at 1293.

Under the *Lozman* exception, the existence of probable cause does not defeat a First Amendment retaliation claim where several conditions are satisfied. A plaintiff must show, for example, that he suffered retaliation as the result of an "'official municipal policy' of intimidation." *Id.* (quoting *Lozman*, 138 S. Ct. at 1954). And he must also show that there was "little relation between the 'protected speech that prompted the retaliatory policy'" and the actions that triggered an allegedly retaliatory response. *Id.* at 1294 (applying *Lozman*, 138 S. Ct. at 1954–55)). In *Lozman*, the plaintiff was arrested for disorderly conduct at a town hall meeting for objecting to the arrest of a former town official, but he alleged that the arrest was actually part of a municipal policy to intimidate him for criticizing the city's eminent domain activities. 138 S. Ct. at 1949–50. His "prior, protected speech" about eminent domain, *Lozman* explained, bore "little relation to the criminal offense for which the arrest [was] made," so his lawsuit could proceed regardless whether there was probable cause for his disorderly conduct arrest. *Id.* at 1954.

Ring and the O'Boyles argue that we should reject *Lozman*'s "little relation" requirement: they claim this element will insulate government actors from liability whenever they directly target protected speech. But this argument misunderstands how the *Lozman* exception functions. True, direct retaliation against protected speech will always bear more than a "little relation" to the speech itself. But there is no question that a state official who directly violates a clearly established First Amendment right can be held liable under section 1983. *See, e.g.*, *Bennett*, 423 F.3d at 1255 (denying qualified immunity for officials who allegedly suppressed protected political expression).

*Lozman* concerned when *probable cause* for an allegedly retaliatory arrest will defeat a First Amendment retaliation claim. Where there is little relation between the protected expression and the allegedly retaliatory action—and where the other *Lozman* elements are met—the plaintiff must show only that the official act would not have occurred but-for the protected expression. *See DeMartini*, 942 F.3d at 1294. But, where the official or municipality acts in direct response to protected expression, it can be held liable only if there was no probable cause to believe the expression was illegal. *Id.* That is what the Supreme Court held in *Lozman* and what we reaffirmed in *DeMartini*.

On appeal, Ring and the O'Boyles do not dispute the district court's conclusion that the town had probable cause to file its RICO suit and state-court counterclaims, the initial bar complaints, or the trespassing charge against Martin O'Boyle. Ring and the O'Boyles

don't argue that they were selectively prosecuted. *Cf. Nieves*, 139 S. Ct. at 1727. And the parties also jointly stipulated before the district court there was probable cause to charge Martin O'Boyle with disorderly conduct and resisting arrest. The sole legal issue on appeal is thus whether the *Lozman* exception applies to the town's alleged retaliatory actions: the RICO lawsuit and state-court counterclaims, the initial bar complaints, and Martin O'Boyle's criminal charges. We address each in turn.

### A.

The district court correctly found that Gulf Stream's civil litigation fell outside the *Lozman* exception. The town filed the RICO suit and state-court counterclaims as a direct response to the hundreds of public records requests, and multiple lawsuits, that were draining municipal resources and manpower. *See O'Boyle I*, 654 F. App'x at 442. Even though the litigation was ultimately unsuccessful, the town was attempting to pursue legitimate goals: preventing harassment and minimizing public expenditures on legal fees.

The appellants argue that Mayor Morgan's "firm stance" letter and the speech he gave at the September 2015 town hall show evidence of the town's retaliatory intent. But the letter actually highlights the connection between the town's legal actions, the public records requests, and the public records litigation. Mayor Morgan specifically noted the financial burden of the records requests as a reason for the town to adopt a more aggressive response. The letter thus shows that the town's litigation strategy

bore more than "little relation" to the public records requests. *Cf. Lozman*, 138 S. Ct. at 1954.

### B.

The district court also correctly concluded that the bar complaints the town filed against Ring and Jonathan O'Boyle were closely related to their public records litigation activity. The bar complaints included as potential ethics violations: (1) Jonathan O'Boyle's appearance in the public records litigation cases without a license from The Florida Bar; (2) The O'Boyle Law Firm's "feeder relationship" with Martin O'Boyle and the businesses he created to carry out his public records litigation; and (3) the firm's "windfall fee scheme" of threatening Gulf Stream with litigation unless it agreed to settlements in excess of The O'Boyle Law Firm's actual fees and costs. All of these bases for the bar complaints were intimately linked to Ring and the O'Boyles' protected activity—asking for public records and filing lawsuits about the requests.

### C.

Martin O'Boyle's criminal charges also fell outside the *Lozman* exception. As the district court explained, false prosecution claims are governed not by *Lozman* but by *Hartman v. Moore*, 547 U.S. 250 (2006). Because the State Attorney's decision to charge O'Boyle added a layer of independent judgment between a government official's alleged retaliatory motive and the criminal charges filed, *Hartman* made "showing an absence of probable cause" a

necessary "element[] of the tort" of retaliatory prosecution. *Id.* at 263.

On appeal, Martin O'Boyle argues that because the Gulf Stream police chief pressed charges against him, we should apply *Lozman* rather than *Hartman*. But it was the State Attorney who filed the information against Martin O'Boyle to trigger the prosecution, and not anyone who worked for the town. *See Doe v. State*, 634 So. 2d 613, 615 (Fla. 1994) ("Florida's state attorney acts in noncapital investigations as a one-person grand jury . . . ."). Even if Chief Ward wanted to retaliate against O'Boyle, "[e]vidence of [a police officer's] animus does not necessarily show that the [officer] induced the action of a prosecutor." *Hartman*, 547 U.S. at 263. Showing the absence of probable cause is thus necessary to "bridge the gap between the nonprosecuting government agent's motive and the prosecutor's action." *Id.* In light of *Hartman*, the parties' stipulation that there was probable cause to charge Martin O'Boyle with trespass and disorderly conduct was fatal to his retaliatory prosecution claim. The district court did not err.

## CONCLUSION

Because Ring and the O'Boyles either stipulated, or did not contest on appeal, that probable cause existed for the actions the complaint identified as retaliatory, and because *Lozman* doesn't apply to any of those acts, the district court did not err in granting Gulf Stream's motion for summary judgment.

**AFFIRMED.**